IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 3:12CR082 (JAG) |
| v. | ) | |
| | ) | |
| LENORA BANKS-DAVIS, | ) | |
| a/k/a "Jacqui Banks-Davis" | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING POSITION OF THE UNITED STATES
AND MOTION FOR UPWARD VARIANCE**

The United States of America, through its attorneys, Neil H. MacBride, United States

Attorney, and Michael R. Gill and Dominick S. Gerace, Assistant United States Attorneys,

hereby submits its position with respect to the defendant's sentencing factors and motion for

upward variance.

**INTRODUCTION**

This case is based on Banks-Davis's most recent efforts in a long history of fraud

directed at P.T., an 84 year-old widow and life-long resident of the Richmond community.   The

charged conduct focused on the defendant's 2009 scheme to fraudulently obtain and use P.T.'s

credit card for paying the defendant's own personal expenses and obligations.  At the conclusion

of trial, the jury found Banks-Davis guilty of Bank Fraud and Unauthorized Use of an Access

Device in connection with the 2009 scheme.

The Presentence Investigation Report (PSR) calculates the offense level as 13, coupled

with a Criminal History Category II, which yields a guideline range of 15 to 21 months

imprisonment.  *PSR* Worksheet D ¶¶ 3, 4, and 6.  These calculations, however, are derived solely

from the 2009 scheme and do not account for the actual scope and impact of the defendant's

criminal conduct and the devastating impact it has had on P.T.  In that vein, the evidence shows

that Banks-Davis's criminal conduct against P.T. has been going on for decades, fueled by the

defendant's unrelenting greed and complete lack of compassion.  The weight of that conduct has

left P.T. completely distraught, afraid that she will be forever pursued by creditors and that she

will never be able to trust anyone outside of her family circle again.  Banks-Davis has also

targeted others, including other elderly victims and a local church.  Because the guideline range

fails to account for this conduct, the United States requests an upward variance of 10 offense

levels to an offense level of 23, and believes that the defendant should be sentenced to 60

months' incarceration.

## BACKGROUND

A.      **Banks-Davis's Charged Criminal Conduct Directed at P.T.**

As portrayed at trial, Banks-Davis orchestrated a scheme in 2009 which  allowed her to

obtain and use P.T.'s BB&T Bank credit card for the purpose of paying the defendant's own

personal expenses and obligations.  The defendant procured P.T.'s credit card by falsely

representing and promising that Banks-Davis would use the credit card only to help P.T.

consolidate and pay off P.T.'s financial obligations.  Instead of fulfilling that promise, Banks-

Davis charged thousands of dollars of her own expenses onto P.T.'s card without P.T.'s

knowledge or authorization.  From late May through November 2009, the defendant ran up over

$13,000 in charges at a number of establishments, ranging from mundane expenses to

extravagant luxuries.

In July 2009, P.T. discovered the defendant's treachery, and begged her to stop abusing her (P.T.'s) credit card. Banks-Davis rebuffed P.T.'s plea and told her victim that she had simply misunderstood their arrangement. The spending spree continued with P.T. at home worried about her financial future, while the defendant freely spent her victim's credit card to the limit. At trial, the defendant did not contest the fact that she made purchases on P.T.'s credit card. Instead, her defense was that P.T. had actually authorized defendant to use P.T.'s credit card for defendant's personal expenses. The jury rejected that defense and found Banks-Davis guilty on Counts One and Two.

**B.      Banks-Davis's Previous Criminal Conduct Directed at P.T. Dating Back Over 30 Years.**

Aside from the 2009 scheme, the evidence at trial provided an overview of the history between Banks-Davis and P.T. – a history that was marked by P.T.'s willingness to trust the defendant with her finances and Banks-Davis's callous disregard for P.T.'s financial future. P.T. first met Banks-Davis through her (P.T.'s) daughter over 30 years ago. Thereafter, Banks-Davis offered P.T. a "helping hand" with her finances and P.T.'s nightmare began soon after the defendant secured her victim's personal information for use in handling life insurance and other financial matters. Although all of the sordid details of Banks-Davis's multi-decade theft from P.T. have been lost with the passage of time, the United States has pieced together a number of concrete areas illustrating the defendant's ruthless conduct.

One major area of deception started soon after P.T. and Banks-Davis met. The defendant encouraged P.T. to get a New York Life insurance policy. The defendant then caused checks for loans to be issued from P.T.'s life insurance policy in amounts totaling over $3,000 beginning in 1988, with no accountability regarding the use of those funds. Over the years, over $13,000 in

interest has accrued on those loans, reducing the value of P.T.'s policy (cash value and death

benefit) by over $17,000 as of August 2012.[1]

The second area relates to the Defendant's conduct in persuading P.T. to execute Power

of Attorney and Waiver forms, providing the defendant with back-dated authorization to handle

P.T.'s affairs and erasing debts owed by the defendant to P.T. as of July 14, 1993.  The first form

specifically provided that any and all monies owed by P.T. to Banks-Davis were agreed by P.T.

of her "own free will" and that all payments were accepted to the satisfaction of P.T. as of the

date of the note, July 14, 1993.  Gov't Trial Exhibit 49(a).  The second form provided:

> I, Portia Turner, authorized Jacqui Banks to have full power of
> attorney over all of my business affairs from January 1988 until
> December 31, 1995 unless changed or reversed by me prior to that
> date.  Jacqui Banks has full authorization to speak in my behalf
> and sign any checks pertaining to my account(s).

Gov't Trial Exhibit 49(b).  The second form was executed on July 14, 1993, though it purported

to give Banks-Davis power of attorney over P.T.'s affairs over five years earlier.  Not

coincidentally, the form gave Banks-Davis power of attorney starting in 1988, when loans were

first drawn from P.T.'s life insurance policy.

The final area involves Banks-Davis's acts in opening and using multiple credit card

accounts in P.T.'s name without P.T.'s knowledge or authorization.  The investigation revealed

that at some point in the 1990s leading up to 2000, Banks-Davis opened and used different credit

card accounts in P.T.'s name.   Two of the unauthorized credit cards included a First USA Bank

---

[1] Documents from N.Y. Life depicting P.T.'s life insurance policy and loan information are
attached hereto as Exhibit A.  The checks issued from the policy were introduced at trial as
Defense Exhibit 1 during the cross-examination of P.T.

credit card and a Chase Bankcard credit card, resulting in a substantial debt bearing down on

P.T. leading up to 2000.

In an attempt to diffuse the credit card situation, Banks-Davis secured the assistance of

an attorney named William Irvin.  Mr. Irvin jointly represented both Banks-Davis and victim

P.T. with respect to resolving the debt disputes that arose out of the defendant's misconduct.  As

depicted at trial, during the course of that representation in 2000, Mr. Irvin wrote two letters

advising each credit card company of the realities of the situation, as explained to him by the

defendant and P.T.  Below is a portion of the language from each of the letters showing the

defendant's unauthorized use of both credit cards:

- **February 4, 2000 Attorney Irvin Letter to North American Capital Corporation on behalf of Banks-Davis in relation to a First USA Bank credit card:** "We represent Lennora [sic] R. Banks-Davis in connection with the referenced account.  We understand that you have previously been advised by the person whose name is on the account, [P.T.], that the account was opened without her authority or knowledge and that she is not responsible for this debt.  You have also been advised by Ms. Banks-Davis that she accepts responsibility for this debt." Gov't Trial Exhibit 50.

- **September 20, 2000 Letter to Card Member Services on behalf of P.T. in relation to a Chase Bankcard:** "We represent [P.T.] in connection with the referenced account.  We understand that you have previously been advised by [P.T.] that the account was opened and/or used without her authority or knowledge, and that she is not responsible for this debt.  You have also been advised by Ms. Banks-Davis that she accepts responsibility for this debt." Gov't Trial Exhibit 51.

Collection records obtained from NCO Financial Systems, Inc. show that the First USA Bank

credit card was referred for collections with a balance of $10,365.75.[2]

---

[2]A document showing the referred collection amount for the First USA Bank credit card is attached hereto as Exhibit B.

Aside from these cards, the United States uncovered <u>two additional</u> credit card accounts

the defendant had obtained in P.T.'s name without permission or authorization.  Both credit

cards appear to have gone into collection in 2004 with NCO Financial Systems, Inc.–a

Great/Associates National Visa credit card with account number ending in 4761; and a

Smart976/Associates National Visa credit card with account number ending in 7919.  Those

cards had balances of $4,552.08 and $3,887.27, respectively, when referred for collection.  Both

cards appear to have been settled under CRS #415682, with payments under that settlement

being made by the defendant Banks-Davis in 2006 and 2007.[3]

Eventually, these creditors stopped pursuing P.T. and she assumed that the issues had

been resolved.  P.T. had only very sporadic contact with Banks-Davis for the next several years.[4]

At times, Banks-Davis would reappear briefly, sending P.T. flowers or engaging in what seemed

to be nice conversations, during which the defendant often told P.T. that she thought of her as a

mother.  More recently in 2009, the defendant convinced P.T. that she would help P.T. with her

finances by consolidating all of her bills onto her credit card.  P.T. trusted Banks-Davis and was

defrauded once again, which resulted in the charges at the heart of this case.

---

[3]  Documents showing the referred collection amounts for these two cards and payments by Banks-Davis regarding reference number 415682 are attached hereto as Exhibit C.  Notably, records for both accounts state that P.T.'s "daughter['s] name is Jackie Davis."

[4]  Around the same time period of the 2000 credit card disputes, Banks-Davis was under investigation, and ultimately indicted, for orchestrating a bankruptcy fraud scheme.  On March 1, 2001, Banks-Davis pleaded guilty to two counts of Bankruptcy Fraud, in violation of 18 U.S.C. § 152.  On June 1, 2001, Judge Robert E. Payne sentenced Banks-Davis to 30 months in federal prison for those offenses.

C.      **Banks-Davis's Criminal Conduct Towards Others.**

The investigation revealed that the defendant's deception and criminal acts stretched to a

number of other victims aside from P.T.  For instance, just prior to tricking P.T. into giving her

the BB&T Credit Card, Banks-Davis convinced members of the Bon Air Baptist Church to give

her charity to pay her own personal expenses.  As described at trial, M.K., working with other

Bon Air Baptist Church members, raised over $6,000 to help the defendant.  On February 11 and

13, 2009, M.K. and other church members issued checks directly to the defendant's creditors,

including $792.47 to Dominion Power, $223.21 to Verizon, $156.68 to the County of Henrico,

$637.74 to the City of Richmond, and $140 to two separate doctors.  Also, on March 3, 2009, the

Church issued a check made payable to Banks-Davis's landlord for $4,746 to satisfy the

defendant's delinquent mortgage payments.  The defendant concealed these circumstances and

charitable payments from P.T. when she convinced the victim to provide defendant with the

BB&T credit card, allowing Banks-Davis to "help" the elderly victim consolidate her bills (the

charged conduct at issue).

The jury also learned that Banks-Davis tried to ensnare J.D., a 75 year-old woman, at

Bon Air Baptist Church Sunday School in or about February 2012 when the defendant offered to

help J.D. with her financial situation.  Similar to what had happened with P.T., Banks-Davis

obtained J.D.'s personal identifying information and, without authorization, applied for multiple

credit cards in J.D.'s name.  When the credit card applications and documents began showing up

on J.D.'s doorstep, she realized that something was wrong and took steps to distance herself

from the defendant.  Banks-Davis convinced J.D. to loan Banks-Davis $700 during this same

time period, and later attempted to pay J.D. back with two checks for $200, each of which

"bounced" for insufficient funds.  It was only after J.D. threatened to take legal action against the defendant that she finally received reimbursement for the loan.

## POSITION ON SENTENCING AND REQUEST FOR UPWARD VARIANCE

In imposing a sentence after *Booker*, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Diosdado-Star*, 630 F.3d 359, 364 (4th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 51-52 (2007)).   "However, 'the Guidelines are not the only consideration . . . the district judge should [also] consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party.'" *Id.* (citing *Gall*, 552 U.S. at 49-50).  In making this determination:

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (*quoting* 18 U.S.C. § 3553(a)).

As recently recognized by the Fourth Circuit in *Diosdado-Star*, there is a two-step analysis in assessing the reasonableness of an upward variance.  First, the court must ensure that it does not commit any significant procedural error in making a variance, such as "'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range.'" *Diosdado-Star*, 630 F.3d at 363 (quoting *Gall*, 552 U.S. at 51).

Then, the sentencing court must explain the basis for any variance, taking into account the application of § 3553(a) factors and whether they justify a substantial deviation from the Guidelines. *Id.* at 366. On appeal, the Fourth Circuit takes into account:

> the totality of the circumstances, including the extent of any variance from the Guidelines range. . . . [I]f the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify a reversal of the district court.

*Id.* (quoting *Gall*, 552 U.S. at 51). Although a district court's justification for the sentence must support the degree of the variance and a major departure should be supported by more significant justification than a minor one, a district court need not justify a sentence outside the Guidelines range with a finding of extraordinary circumstances. *Id.*

A.     **Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)).**

The nature and circumstances of the offense warrant an upward variance in this case because the calculated guidelines range fails to adequately reflect the seriousness of the Banks-Davis's crimes. Testimony at trial established that just before fraudulently obtaining P.T.'s credit card, Banks-Davis received over $6,000 in charity from Bon Air Baptist Church to pay off some of Banks-Davis's essential bills. Not satisfied with this charity, Banks-Davis embarked on a fraudulent scheme to use P.T.'s credit card for a personal spending spree, maxing out the card at stores like Brooks Brothers, Godiva Chocolate, and L'Occitane.

Banks-Davis's choice of P.T. as her victim for this scheme was not accidental. Banks-Davis had known P.T. for 30 years and during this long-term relationship had repeatedly defrauded P.T. In the 1980s, Banks-Davis used her position as a P.T.'s life insurance broker to

obtain P.T.'s personal identifying information, and took loans out on P.T.'s life insurance policy

that remain unpaid to this day.  In the 1990s and early 2000s, Banks-Davis used P.T.'s personal

identifying information to apply for and charge up credit cards in P.T.'s name.  Banks-Davis

knew P.T. well, knew that P.T. was an easy target, and pounced on P.T. at the first opportunity in

2009.  Having thrown P.T. into financial disarray in the past, Banks-Davis did not hesitate to do

the same in 2009.

The sentencing guidelines here are largely driven by the amount of loss calculated under

U.S.S.G. § 2B1.1.  But in some cases, the amount of loss substantially understates the

seriousness of the offense, and a sentence well above the guidelines range is therefore

appropriate. This is one such case.  The amount of loss related to the BB&T credit card simply

does not account for Banks-Davis's callous disregard for P.T.'s financial welfare, nor does it

account for the toll that Banks-Davis's conduct has taken on P.T. financially, mentally, and

emotionally.  Application Note 19(A)(vi) to U.S.S.G. § 2B1.1[5] recognizes that in cases involving

an access device, a sentence above the calculated guidelines range may be warranted where the

offense caused substantial harm to the victim's reputation or credit record, or where the victim

suffered a substantial inconvenience related to repairing her reputation or credit record.  Here,

P.T.'s credit and reputation have been substantially compromised by Banks-Davis's conduct to

the point where P.T. still reports receiving constant calls from creditors due to Banks-Davis's

---

[5] Application Note 19(A) relates to considerations for upward departures.  While the United States is moving for an upward variance based on the factors of 18 U.S.C. § 3553(a) and not for an upward departure under that or any other provision of the sentencing guidelines, Application Note 19(A) is instructive regarding circumstances where the amount of loss in a case may not adequately reflect the nature and seriousness of the offense.  *E.g.*, *Diosdado-Star*, 630 F.3d at 365 (recognizing that the practical effects of applying a departure or variance are the same).

conduct.  In her letter describing the impact of Banks-Davis's crime, P.T. reported that, to this

day, she is afraid and ashamed to answer the phone because it might be a creditor on the line.

Those creditor calls, and the damage to P.T.'s credit rating, is not isolated to the events in 2009.

P.T. has been battling creditors and a poor credit rating since the 1990s, when Banks-Davis

engaged in similar conduct and, at one point, had to employ an attorney, Mr. Irvin, to stop

creditors from calling P.T.

An upward variance is also warranted in this case to account for the toll that Banks-

Davis's conduct has taken on P.T. mentally and emotionally.  Application Note 19(A)(ii) of §

2B1.1 recognizes that a sentence above the guidelines range may be warranted where the offense

conduct caused or risked substantial non-monetary harm, like psychological harm or emotional

trauma.  The United States submits that those factors are also present here.  In her victim impact

statement, P.T. has detailed the emotional and psychological toll of Banks-Davis's crimes.  P.T.

visits her doctor regularly and now suffers from anxiety attacks due to Banks-Davis's actions.

P.T. lives in constant worry about creditors and dreads having to pay her bills.  P.T. reports that

she lies awake at night, wondering how she could have let Banks-Davis victimize her again.

These are issues that Banks-Davis has brought into P.T.'s life.  Banks-Davis's conduct has taken

a severe mental and psychological toll on P.T., an elderly widow, and the guidelines range in this

case does not adequately account for that serious consequence.

Because the amount of loss in this case does not adequately account for the seriousness

of Banks-Davis's offense and its impact on P.T., an upward variance from the guidelines range is

warranted.  The United States submits that an upward variance of 10 levels and a sentence of 60

months' imprisonment adequately accounts for the seriousness of the offense and the toll that

defendant's conduct has taken on P.T.'s credit, reputation, and mental and emotional health.

**B.      History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)).**

The history and characteristics of the defendant also warrant an upward variance in offense level.  The PSR discusses the history and characteristics of Banks-Davis in detail, but it is worth highlighting a few points here.

First, as discussed above, Banks-Davis has a long history of defrauding the victim in this case.  Banks-Davis mercilessly victimized P.T. on and off for decades and has shown a predilection for targeting elderly victims by gaining their trust and offering them "help," as further evidenced by her similar actions toward J.D. in 2012.  In some instances, a defendant's criminal history calculation under the guidelines understates the seriousness of the defendant's history or the likelihood that the defendant will commit further crimes.  *E.g.*, U.S.S.G. § 4A1.3(a) (1).  For example, a defendant's criminal history score may not adequately reflect the seriousness of the defendant's history where the defendant in the past engaged in similar criminal conduct that did not result in a criminal conviction.  *E.g.*, § 4A1.3(a)(2)(E).  Here, Banks-Davis has repeatedly engaged in similar fraudulent conduct toward P.T. over the course of decades.  As the testimony of Mr. Irvin showed during trial, Banks-Davis has used P.T.'s personal identifying information to open and run up charges on other credit cards under P.T.'s name without P.T.'s knowledge and authorization. The United States also uncovered at least two other credit cards in P.T.'s name that went into collection in 2004 and on which Banks-Davis eventually made payments to satisfy creditors.  This conduct has never resulted in a criminal conviction and the United States submits that an upward variance is warranted to account for this conduct.

Second, Banks-Davis has shown throughout her history that she is incapable of accepting responsibility for and ceasing her fraudulent ways.  As discussed in the PSR, Banks-Davis was previously convicted of fraud in federal court and was sentenced to 30 months' imprisonment.  Yet, the defendant has continued to commit crimes of fraud even after that conviction and apparently denies any responsibility for that previous conduct.  In 2001, Banks-Davis was convicted of a bankruptcy fraud scheme whereby she used nominees to purchase properties with fraudulent loan applications.  She obtained the funds of other people, converted those funds for her own use, and failed to list those persons as creditors on her bankruptcy schedule.  Although she pled guilty to those acts, Banks-Davis maintains that she did nothing wrong.  As detailed in the PSR, when on supervised release for this previous offense, Banks-Davis decided that she did not need to speak to a therapist about what she called her "alleged" unlawful behavior and declared herself innocent of the charges to which she pled guilty.  PSR at ¶¶ 58, 59.  Moreover, Banks-Davis was released from prison on March 24, 2003.  *Id.* at ¶ 40.  Shortly after her release, two credit cards that were in P.T.'s name and connected to the defendant (who the collection agency had listed as P.T.'s "daughter") went to collection proceedings in 2004.  *See* Ex. C.

Banks-Davis's failure to take responsibility for her criminal conduct appears to be a theme.  As with her previous conviction, Banks-Davis also apparently fails to accept any responsibility for her fraudulent actions toward P.T.  The PSR reports that following her conviction in this case, Banks-Davis mailed voluminous writings to the Probation Department in which she defended her conduct toward P.T. as well as her conduct in the previous fraud case.  Though the United States has not seen the contents of these writings, defendant seems to believe that she is somehow the victim of her own criminal conduct.  Accordingly, not only does Banks-

13

Davis's criminal history score tend to under-represent her history, but she has shown a

propensity to recidivate and her inability to accept any responsibility for her actions makes her

more likely to recidivate than the average defendant with a similar criminal history score.

In sum, Banks-Davis has a history of defrauding P.T. through similar conduct for which

there is no criminal conviction. Moreover, Banks-Davis has committed fraud before and has

shown that she is incapable of demonstrating remorse for any of her crimes or admitting that her

actions were wrong. Thus, the likelihood of recidivism is greater than suggested by her criminal

history category. The United States submits that an upward variance of 10 offense levels and a

sentence of 60 months' imprisonment adequately accounts for these factors.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to
         Afford Adequate Deterrence, and to Protect the Public (18 U.S.C. § 3553(a)(2)).**

The upward variance and sentence recommended by the United States will also reflect

the seriousness of the offense, afford adequate deterrence, and protect the public. As discussed

above, the criminal conduct at the heart of this case is extremely serious and is not adequately

reflected by the amount of pecuniary loss. Banks-Davis continued her pattern of abusing P.T.'s

trust and greedily spent P.T.'s credit card to the limit with complete disregard for P.T.'s financial

future. As a consequence of Banks-Davis's actions, P.T.'s credit and reputation have been

ruined, and P.T.'s is suffering mentally and emotionally. The guidelines, as calculated, do not

account for these factors and should be adjusted upward as discussed above to account for the

true scope and seriousness of Banks-Davis's conduct.

On top of the seriousness of the criminal conduct here are the paramount needs of

providing the proper level of deterrence and protecting the public at large. Here, general

deterrence is clearly important because this case involves the financial exploitation of an 84-

year-old woman.  The exploitation of older Americans is an increasing problem in this country.

One study estimated that financial loss by victims of elder financial abuse in 2010 was $2.9

billion.[6]  And the opportunities for elder financial exploitation are likely to increase in this

country as the baby-boomer generation ages.   An upward variance to 60 months' imprisonment

will send a strong message of deterrence to anyone contemplating financially exploiting older

Americans.

A sentence well above the guidelines range will also serve the interests of specific

deterrence and protect the public from further crimes from the defendant.  As discussed above,

prior to her conduct in this case, Banks-Davis had already been convicted of a federal fraud

offense and was sentenced to 30 months' imprisonment.  Given her actions against P.T. in this

case, Banks-Davis appears to have learned nothing from that sentence.  Indeed, Banks-Davis

denies responsibility for the conduct giving rise to that conviction and, according to the PSR, she

appears to be following the same pattern of denying responsibility for her crimes in this case.  As

a result of her inability to accept responsibility for her actions, she is more likely to recidivate

than other defendants with a similar criminal history score.  An upward variance to 60 months'

imprisonment would afford the specific deterrence that Banks-Davis's previous sentence of 30

months did not, and it would protect the public, particularly the elderly population of Richmond,

from further crimes of the defendant.

---

[6]The MetLife Study of Financial Elder Abuse (2011), available at http://www.metlife.com/assets/
cao/mmi/publications/studies/2011/mmi-elder-financial-abuse.pdf.

**D.**     **The Kinds of Sentences Available, the Applicable Sentencing Range, and the Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(3), (4), and (6)).**

The PSR calculates an offense level of 13, Criminal History Category II, yielding a guideline range of 15-21 months.  As discussed above, this recommended sentencing range is not appropriate in light of the other 18 U.S.C. § 3553(a) factors.  The United States respectfully requests that this Court vary upward 10 additional levels to an offense level 23, yielding a guideline range of 51-63 months.  Within that range, the United States requests a sentence of 60 months, which is proper under the factors outlined in 18 U.S.C. § 3553(a).  This sentence will not cause unwarranted sentencing disparities due to the nature and circumstances of the offense, the defendant's repeated victimization of P.T., and the demonstrated propensity of the defendant to commit fraud offenses and to take no responsibility for those actions.

**CONCLUSION**

For the reasons stated above, the United States submits that a sentence of 60 months is just and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

        /s/

Michael R. Gill
Dominick S. Gerace
Assistant United States Attorneys
Attorneys for the United States
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Phone: 804/819-5400
Fax: 804/771-2316
Email: mike.gill@usdoj.gov
       dominick.s.gerace@usdoj.gov

16

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such

filing (NEF) to the following:

David R. Lett
700 East Main Street, Suite 1644
Richmond, Virginia 23219


                                            /s/
                              Dominick S. Gerace
                              Michael R. Gill
                              Assistant United States Attorneys
                              Attorneys for the United States
                              United States Attorney's Office
                              600 East Main Street, Suite 1800
                              Richmond, Virginia 23219
                              Phone: 804/819-5400
                              Fax: 804/771-2316
                              Email: mike.gill@usdoj.gov
                                      dominick.s.gerace@usdoj.gov


17